**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| | * | **Case No. 20-MJ-00701-ADC-1** |
| **v.** | * | |
| | * | |
| | * | |
| **NATHANIEL RATCHFORD** | * | |
| | * | |
| | * | |
| **Defendant** | * | |

\*\*\*\*\*\*\*\*\*\*\*\*

**<u>MEMORANDUM OPINION AND ORDER OF COURT</u>**

This matter is before the Court on the defendant's Emergency Motion to Reopen Detention Hearing and to Order Pretrial Release (the "Motion") (ECF No. 15), the defendant's Supplement to Emergency Motion to Reopen Detention Hearing (the "Supplement") (ECF No. 16), the government's Response in Opposition to Defendant's Appeal of Detention Order (the "Opposition") (ECF No. 17), the defendant's Reply in Support of Motion to Reopen Detention Hearing and to Order Pretrial Release (the "Reply") (ECF. No. 18), the defendant's Supplement to Emergency Motion to Reopen Detention Hearing and to Order Pretrial Release (the "Second Supplement") (ECF No. 21), and the government's Response in Opposition to Defendant's Supplement to His Emergency Motion to Reopen Detention Hearing and to Order Pretrial Release (the "Response") (ECF No. 23). The issues have been fully briefed, and no hearing is necessary. L.R. 105.6, 207. For the reasons stated below, the Motion is **DENIED.**

<u>I. PROCEDURAL HISTORY</u>

On March 4, 2020, a criminal complaint was filed, charging the defendant with Possession of a Firearm by a Prohibited Person, in violation of 18 U.S.C. § 922(g)(1). The

defendant appeared for his initial appearance on March 10, 2020. On March 13, 2020, the defendant appeared before this Court for a detention hearing.

## II. DETENTION HEARING

After hearing from the parties at the detention hearing, the Court reviewed the factors set forth in 18 U.S.C. § 3142(g). The first factor required the Court to review the nature and circumstances of the offense charged. The Court noted that the defendant was charged with an offense involving a firearm. *See* 18 U.S.C. § 3142(g)(1). The second factor required the Court to consider the weight of the evidence against the defendant. The Court found that the weight of the evidence against the defendant was strong based on the following information proffered by the government. On November 4, 2019, detectives with the Baltimore Police Department were patrolling the 1200 block of West Baltimore Street in Baltimore. This is an area prone to violence and drug trafficking. The detectives observed the defendant walking along the street. They observed a large bulge in his front waistband. The defendant looked toward the detectives and touched his front waistband, which the detectives believed to indicate that he possessed a firearm. When approached by the detectives, the defendant threw food he was holding to the ground, grabbed his front waistband, and fled on foot. As he was fleeing the detectives, the defendant threw a handgun over a wall into a construction site. The defendant was then apprehended. The detectives recovered a loaded handgun in the netting above the wall where the defendant threw it. At the time, the defendant was prohibited from possessing a firearm. *See id.* § 3142(g)(2).

The third factor required the Court to consider the history and characteristics of the defendant. Here, the Court noted the defendant has lived in Baltimore his entire life, has strong ties to the area, and has strong family support. The Court noted that the defendant has struggled

with substance-abuse issues in the past. The Court then reviewed the defendant's criminal history, which includes convictions for the following offenses: Possession with Intent to Distribute a Controlled Dangerous Substance (2004, 2008), Assault-Second Degree (2004), Distribution of a Controlled Dangerous Substance (2007), and Possession of a Firearm and Ammunition by a Convicted Felon (2012). The defendant served a sentence of 87 months' incarceration for the 2012 felon-in-possession conviction, followed by three years of supervised release. During the period of supervised release, seven noncompliance reports were filed by his supervising officer. On February 7, 2019, the defendant was found in violation of supervised release, sentenced to a period of 90 days' incarceration for the violation, and supervised release was terminated. The present offense occurred about six months after his release from that period of incarceration. The prior felon-in-possession offense occurred about one month after his probation in the 2008 possession-with-intent-to-distribute case was revoked. The 2008 possession-with-intent-to-distribute offense occurred while the defendant was on probation for the 2007 distribution offense. The defendant has been found in violation of probation and supervised release on two occasions. His record also reflects the issuance of several warrants for failure to appear. *See id.* § 3142(g)(3).

The fourth and final factor required the Court to assess the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. The Court found that the defendant would pose a serious danger to the community if released. The evidence against the defendant is overwhelming. He was in possession of a loaded handgun in a high-crime area, fled from the police when approached, and attempted to dispose of the weapon. The offense occurred at a time when the defendant was prohibited from possessing a firearm because of felony convictions. In fact, the defendant was convicted of a similar offense in this

Court in 2012, and the present offense occurred about six months after his supervised release was terminated in that case. Based on these facts and the rest of his criminal history, the Court concluded that the defendant would pose a serious danger if released. *See id.* § 3142(g)(4).

The Court then considered whether there were conditions of release that could be fashioned to mitigate that danger and assure the safety of the community and the defendant's appearance as required. The defendant proposed a release plan that included the appointment of his mother as third-party custodian and 24-hour home detention with location monitoring in the residence of his mother, with permission to leave the residence only for court obligations, meetings with counsel, and medical appointments. The Court considered that proposal, but it concluded that it was not sufficient to mitigate the danger. Ultimately the Court found by clear and convincing evidence that there was no condition or combination of conditions that would reasonably assure the defendant's presence as required and community safety. Therefore, the Court ordered that the defendant be detained. *See* Order of Detention (ECF No. 12). At the present time the defendant is detained in the D.C. Department of Corrections (the "DOC") at the D.C. Jail.

## III. THE § 3142(g) FACTORS

Under 18 U.S.C. § 3142(f), a detention hearing

> may be reopened, before or after a determination by the judicial officer, at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community.

The defendant argues that the detention hearing should be reopened because information exists that was not known to him at the time of the detention hearing, and that this information has a material bearing on the issue of whether there are conditions of release that will reasonably

assure his appearance as required and the safety of any other person and the community.  He then argues that, considering the new information, conditions of release can be fashioned to assure his appearance as required and the safety of any other person and the community.

Specifically, the defendant asserts that, because of the infiltration of the coronavirus at the D.C. Jail, his continued detention "endangers his health and poses a greater risk to community safety than his release."  Motion (ECF No. 15 at 1).  Notably, unlike many other detainees who have recently filed motions for release in the Court, the defendant does not claim that, because of a particular physical or mental condition, or advanced age, he is at an increased risk of contracting the virus or suffering severe complications if he does.  *See, e.g.*, *United States v. Wheeler*, Criminal Case No. CCB-19-0455, 2020 WL 2085473 (D. Md. Apr. 30, 2020) (asthma, COVID-19, diabetes); *United States v. Lee*, No. ELH-19-159, 2020 WL 1974881 (D. Md. Apr. 24, 2020) (high blood pressure, obesity, depression); *United States v. Green*, Criminal Case No. CCB-19-0539-1, 2020 WL 1873967 (D. Md. Apr. 15, 2020) (asthma, high blood pressure, chronic obstructive pulmonary disease); *United States v. Williams*, Criminal Case No. PWG-13-544, 2020 WL 1434130 (D. Md. Mar. 24, 2020) (advanced age); *United States v. Bilbrough*, Criminal Case No. TDC-20-0033 (D. Md. Mar. 20, 2020) (diabetes), *aff'd*, 2020 WL 1694362 (D. Md. Apr. 7, 2020); *United States v. Martin*, Criminal Case No. PWG-19-140-13, 2020 WL 1274857 (D. Md. Mar. 17, 2020) (diabetes, high blood pressure, asthma).  Rather, the defendant relies primarily upon the greater risk of exposure and contraction of COVID-19 for all persons detained in detention facilities.  Further, the defendant asserts that the DOC's "response to the pandemic is deficient, on its face and in practice."  Reply (ECF No. 18 at 2).

COVID-19 is a worldwide pandemic that has had a profound impact on the health and daily life of millions of people.  In the recent case of *Coreas v. Bounds*, Civil Action No. TDC-

20-0780, 2020 WL 1663133 (D. Md. Apr. 3, 2020), United States District Judge Theodore D.

Chuang summarized the nature of the virus, the risks of exposure to it, and the steps employed

by local governments and communities to curtail its spread:

> The virus identified as SARS-CoV-2, commonly referred to as the novel coronavirus ("the Coronavirus"), has caused a global pandemic of the condition known as COVID-19.  As of April 3, 2020, there were 932,166 confirmed cases and 46,764 deaths worldwide.  *Coronavirus Disease (COVID-19) Pandemic*, World Health Org., https://www.who.int/emergencies/diseases/novel-coronavirus-2019.  As of April 2, 2020, there were 213,144 confirmed cases and 4,513 deaths in the United States.  *Cases in U.S.*, Ctrs. for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html.  The Centers for Disease Control and Prevention ("CDC") has projected that, without effective public health intervention, about 200 million people in the United States may contract the disease, and, under some projections, as many as 1.5 million people in the United States may die from the disease.  Another organization's projection puts the potential number of American fatalities at 2.2 million. Moreover, some evidence suggests that, even when not fatal, COVID-19 results in long-term, serious illnesses, which may include severe damage to internal organs, in about 16 percent of cases.

> COVID-19 poses special risks for the elderly and those with certain preexisting medical conditions.  *Amici Curiae* Public Health and Human Rights Experts Br. at 6-7, ECF No. 32.  The CDC has identified several medical conditions that place an individual at an increased risk of serious COVID-19 complications: "blood disorders, chronic kidney or liver disease, compromised immune system, endocrine disorders, including diabetes, metabolic disorders, heart and lung disease, neurological[,] neurologic and neurodevelopmental conditions, and current or recent pregnancy."  Greifinger Decl. ¶ 7, Reply Mot. TRO ("Reply") Ex. 6, ECF No. 52-6.  Of those who have died from COVID-19 in Italy, another country experiencing a high number of COVID-19 cases, about three-fourths had high blood pressure, one-third had diabetes, and one-third had heart disease.  According to Dr. Jonathan Louis Golob, an Assistant Professor at the University of Michigan School of Medicine, there is evidence that in the highest risk populations, COVID-19 causes death in about 15 percent of cases. Preliminary data from China has shown that 20 percent of COVID-19 cases involving high-risk categories have resulted in death.

> There is no vaccine, antiviral treatment, or cure for COVID-19.  The Coronavirus is believed to spread through "droplets" that can be transmitted during close interpersonal contact, though these droplets can also survive on surfaces for days and spread the disease even absent such close contact.  *Id.* ¶ 21. There is some evidence that individuals with the Coronavirus can transmit it to others even when they are not yet symptomatic.  Public health measures aiming to

stop the spread of the virus—most notably the practice of social distancing—have been widespread: "[s]chools, courts, collegiate and professional sports, theater and other congregate settings have been closed," *id.* ¶ 8, and many states have issued mandatory social distancing polices. The Governor of Maryland issued a stay-at-home order on March 30, 2020. *See* Order of the Governor of the State of Maryland § II, No. 20-03-30-01 (Mar. 30, 2020), https://governor.maryland.gov/wp-content/uploads/2020/03/Gatherings-FOURTH-AMENDED-3.30.20.pdf. As of April 2, 2020, 40 states and the District of Columbia had issued stay-at-home or shelter-in-place orders. *See These States Have Implemented Stay-at-Home Orders*, CNN (Apr. 2, 2020), https://www.cnn.com/2020/03/23/us/coronavirus-which-states-stay-at-home-order-trnd/index.html.

*Coreas*, 2020 WL 1663133, at *1-2.

Judge Chuang also reviewed the vulnerabilities of persons detained in jails and detention facilities caused by COVID-19:

> Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19. First, even if these facilities suspend in-person visitation, the staff, contractors, and vendors working at the facilities can still introduce the Coronavirus into the facility, a risk that is all the more difficult to contain because asymptomatic individuals can transmit the virus and because these facilities lack the capacity to screen for the virus in asymptomatic individuals. According to Petitioners' expert, Dr. Robert B. Greifinger, an expert on prison and jail health care and the former manager of medical care for the New York State prison system, "[j]ails and detention centers are congregate environments where the risk of infection and infectious spread are extraordinarily high." Greifinger Decl. ¶¶ 1-2, 16. Indeed, there have already been confirmed outbreaks of COVID-19 at several prisons and detention facilities across the United States, including the Rikers Island detention facility in New York City, the Cook County Jail in Chicago, Illinois, and the federal prison in Oakdale, Louisiana, as well as certain New Jersey jails housing ICE detainees. In this region, COVID-19 has been identified in the Clifton T. Perkins Hospital Center, a psychiatric hospital in Jessup, Maryland; and the D.C. Jail in Washington, D.C.

> Second, once the Coronavirus is introduced into a detention facility, the nature of these facilities makes the mitigation measures introduced elsewhere in the country difficult or impossible to implement. Detention facilities often lack personal protective equipment that helps prevent the transmission of the virus. Shared facilities, such as bathrooms, dining halls, and telephones, are often not disinfected between uses. Poor ventilation increases the risk of transmission. Detained individuals are often not given the opportunity or tools to wash or sanitize their hands frequently. And the crowded nature of the facilities can make social distancing recommended by the CDC impossible.

*Id.* at *2.

As hereinafter discussed, the Court finds that the unprecedented magnitude of the COVID-19 pandemic and the heightened risk of exposure to residents of detention facilities constitute information not known to the defendant at the time of the detention hearing that has a material bearing on whether conditions of release can be fashioned to assure the appearance of the defendant as required and the safety of the community. *See, e.g.*, *Bilbrough*, Order at 4 (D. Md. Mar. 20, 2020); *Martin*, 2020 WL 1274857, at *2. Therefore, the defendant has established a satisfactory basis to reopen the detention hearing. The Court now again reviews the factors set forth in 18 U.S.C. § 3142(g), including the new information identified by the defendant, to determine if there are conditions of release that could be fashioned to assure the defendant's appearance as required and the safety of the community.

The defendant does not challenge the Court's original findings with respect to the first two factors – the nature and circumstances of the offenses charged, and the weight of the evidence against him. Therefore, the Court reaffirms its original findings regarding those factors. Concerning the third factor, the defendant underscores the new information noted above regarding his risk of exposure to COVID-19 and the failure of the DOC to protect adequately detainees from the virus. In response, the government highlights the comprehensive precautionary measures instituted by the DOC to limit the transmission of COVID-19. *See* Opposition (ECF No. 17 at 5-13); Response (ECF No. 23 at 1-8). Regarding the fourth factor, as he did at the detention hearing, the defendant again contends that he would not pose a danger to the community if released. He asserts that his previous firearms offense was more than eight years ago, that the remainder of his convictions dates back to more than a decade ago, and that they mostly involved low-level street drug dealing, without guns or violence. He points out that

the charged offense did not involve his using, brandishing, or selling guns, and did not involve violence, threatened or actualized.  *See* Motion (ECF No. 15 at 4).  The defendant also now asserts that he would not be a danger if released because he has a compelling interest to remain in the residence of his third-party custodian and abide by conditions of release.

> Were Mr. Ratchford to leave the house, or violate any other condition, and be reincarcerated, [he would] once again face a correctional system that is overrun by a public health crisis.  That is precisely the situation that Mr. Ratchford hopes to avoid, why he would abide by all conditions in order to do so.

Motion (ECF No. 15 at 9).

For the same reasons discussed at the detention hearing, the Court affirms its prior finding that the defendant would pose a danger to the community if released.  The new information regarding the defendant's risk of exposure to COVID-19 by virtue of his status as a detainee at the D.C. Jail has no material bearing on the Court's assessment that the defendant would pose a risk to the community if released.  It has a material bearing on what conditions of release could be fashioned to mitigate that danger, but it has no bearing on whether the defendant would, in fact, pose a danger if released.  In the recent case of *United States v. West*, No. ELH-19-364, 2020 WL 1820095 (D. Md. Apr. 10, 2020), the defendant was also charged with a violation of 18 U.S.C. § 922(g).  The government acknowledged that he did not have a history of violence.  In affirming United States Magistrate Judge A. David Copperthite's detention order, United States District Judge Ellen Lipton Hollander noted:

> As the government acknowledges, the defendant does not have a history of violence.  But, a firearm is itself "a tool" of violence.  This is a truism that Baltimore knows all too well.  Indeed, as Judge Copperthite observed, even in the midst of a global pandemic that has brought daily life largely to a halt, Baltimore continues to be racked by gun violence.  Firearms are often used to further drug trafficking activities.

*West*, 2020 WL 1820095, at *3 (citations omitted).

9

The defendant would pose a serious danger to the community if released because he is a dangerous person.  There is overwhelming evidence that the defendant was walking on a street in an area prone to violence and drug trafficking, was carrying a loaded handgun, fled from the police when approached, and attempted to dispose of the weapon.  This occurred only about six months after his supervised release was terminated in a case for which he was convicted of a similar offense.  In that case, he served a sentence of 87 months' incarceration and was placed on three years' supervised release upon his release.  He knew that, if he violated his supervised release, he was subject to an additional period of incarceration.  During his period of supervised release, seven noncompliance reports were submitted by his probation officer.  Ultimately, he was found in violation of supervised release, his term of supervised release was terminated, and he was sentenced to 90 days' incarceration.  He served that sentence, and six months after his release, the present offense allegedly occurred.  Although the defendant characterizes his prior controlled-substance offenses as "low-level street dealing," all of them were felonies for which he served periods of confinement.

Given this finding, the Court must now determine whether there is a condition or combination of conditions of release that will mitigate that danger and assure community safety.  The defendant again proposes that he be released to the custody of a third-party custodian on home detention with location monitoring, being authorized to leave the residence only for court appearances, medical appointments, and emergencies.  The defendant now also argues that he has an even greater incentive to abide by the conditions of release because he wants to avoid being returned to detention and face an increased risk of exposure to COVID-19.  The Court rejected that release plan at the detention hearing, and there is even more reason to reject it now.  At the time of the detention hearing, traditional home detention with location monitoring was an

10

available option as a condition of release.  Traditional home detention with location monitoring requires a probation officer to install a transmitter to the defendant's ankle.  That practice, however, does not permit the probation officer to maintain an appropriate social distance, thereby potentially placing the probation officer and the defendant at a higher risk of transmitting the COVID-19 virus.  As such, the United States Probation Office has suspended this traditional location monitoring and instead now employs other location monitoring techniques, including SmartLink, VoiceID, and Home Incarceration by Phone.  These alternative technologies would not be adequate in this case.  They would not monitor the defendant's location in real time.  Rather, they would determine the defendant's location on a periodic basis throughout the day. With traditional home detention with location monitoring, the monitoring agency would receive an alert the moment a defendant leaves the residence or tampers with the transmitter.  The alternative technologies now in use do not offer that high level of protection.  The defendant could come and go without the knowledge of his probation officer, depending on the timing and frequency of the location checks.

Further, the defendant's argument that he has a greater incentive now to abide by the conditions of release is unavailing, as it is belied by his prior poor adjustment to community supervision and criminal conduct.  As mentioned earlier, in the prior firearms case, he served a sentence of 87 months' incarceration.  Upon his release, he was placed on three years' supervised release.  He knew that, if he did not abide by the conditions of supervised release, he could be ordered to serve another period of incarceration.  Therefore, he had the incentive to abide by the conditions of release because his failure to do so could result in further incarceration.  Nevertheless, seven noncompliance reports were filed, and his supervised release was terminated.  As a result thereof, he was ordered to serve a period of incarceration of 90 days.

Six months after his release, the present offense allegedly occurred.  In connection with his 2007 conviction for a controlled-substance distribution offense, he was sentenced to a period of incarceration of eight years, with seven years, 11 months, and 29 days suspended.  He was placed on probation for three years.  He knew that, if he did not abide by the conditions of probation, he could be found in violation and be ordered to serve practically the entire eight-year sentence.  Nevertheless, he violated probation and was ordered to serve a term of three years' incarceration.  The possibility that he would serve a sentence of up to eight years was not enough of an incentive for the defendant to abide by the conditions of his probation.  Probation in two other felony controlled-substance cases was closed in an unsatisfactory status or revoked.

In making the crucial decision of whether to release a defendant on conditions of release and, if so, what those conditions should be, the Court must have a high level of confidence that the defendant will comply with those conditions.  If the Court does not have that level of confidence, releasing the defendant on conditions would not only be imprudent, but futile.  For the reasons stated above, the Court does not have that high level of confidence in this case.  The defendant has faced the prospect of significant periods of incarceration in the past for violating conditions of supervision.  Yet, he violated the conditions of supervision and was incarcerated.  Six months after he was released from incarceration in the prior firearms offense, he allegedly committed a similar offense.  The Court is not persuaded that the prospect of being returned to detention and facing an increased risk of contracting COVID-19 for violating conditions of release will be any more of an incentive to abide by the conditions of release than the incentive to avoid a significant period of incarceration for violating the conditions of supervision in the past.

In summary, the defendant has established grounds to reopen the detention hearing based on the new information concerning his increased risk of contracting COVID-19 as a result of his detention at the D.C. Jail. Nonetheless, after reviewing the factors contained in 18 U.S.C. § 3142(g), including the new information, the Court again finds by clear and convincing evidence that there is no condition or combination of conditions of release that will reasonably assure the safety of the community and the defendant's presence as required.

## IV.  SIXTH AMENDMENT RIGHT TO EFFECTIVE REPRESENTATION

As an alternative ground for release, the defendant argues that his continued detention at the D.C. Jail violates his Sixth Amendment right to effective representation. *See* Motion (ECF. No. 15 at 12-13). Here, the defendant asserts that, because of the restrictions imposed at the D.C. Jail due to COVID-19, the defendant effectively has been precluded from communicating with counsel. The government, on the other hand, points out the measures in place at the D.C. Jail to allow detainees access to counsel, although restricted. *See* Opposition (ECF No. 17 at 16-18). The Court first notes that access to counsel is not a factor to be considered under 18 U.S.C. § 3142(g). The Court recognizes, however, that the policies and procedures that the D.C. Jail has implemented to enhance the safety of detainees and staff present challenges to communications with counsel. The Court has canceled all non-emergency proceedings through June 5, 2020, however. *See In re: Court Operations Under the Exigent Circumstances Created by COVID-19*, Case No. 1:00-mc-00308, Standing Order 2020-07 (D. Md. Apr. 10, 2020). Therefore, the present restrictions on communications with counsel will not delay his case. Once the Court is fully operational, the defendant and his counsel will have adequate time to consult and prepare his defense. *See West*, 2020 WL 1820095, at *6; *Bilbrough*, 2020 WL 1694362, at *4. Additionally, the Court has ordered the DOC "[e]nsure that Maryland detainees have reasonable

access to their counsel and that counsel have reasonable access to their detained clients, via telephone at least." *In re: COVID-19 Pandemic Procedures*, Misc. No. 20-146 (D. Md. Apr. 23, 2020).  On April 19, 2020, the United States District Court for the District of Columbia ordered that detention facilities operated by the DOC, including the D.C. Jail, "ensure that all inmates, including those on isolation, have access to confidential, unmonitored legal calls of a duration sufficient to discuss legal matters." *Banks v. Booth*, Civil No. 20-849(CKK), 2020 WL 1914896, at *15 (D.D.C. Apr. 19, 2020).  Therefore, counsel should soon be able to communicate more effectively with the defendant.  Finally, assuming *arguendo* that the current restrictions on contacts and communications with counsel constitute a violation of the defendant's Sixth Amendment rights, he fails to cite any authority that his release is an appropriate remedy.  For these reasons the Court does not find that release is warranted based on any infringement of the defendant's Sixth Amendment rights.

## V. TEMPORARY RELEASE UNDER § 3142(i)

As an alternative ground for release, the defendant invokes the provisions of 18 U.S.C. § 3142(i).  Under 18 U.S.C. § 3142(i), the Court "may, by subsequent order, permit the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason."  As stated above, preparation of the defendant's defense is not a compelling reason for release.  In a recent remand to this Court, the Fourth Circuit directed this Court to

> consider in the first instance the severity of the risk that the COVID-19 virus poses to the defendant, given his existing medical conditions and the current COVID-19 situation at the facility where he is being held, and whether that risk, balanced against the other Bail Reform Act factors, rises to the level of a "compelling reason" for temporary release under 18 U.S.C. § 3142(i).

*United States v. Creek*, No. 20-4251, Order at 1 (4th Cir. Apr. 15, 2020).

The Court, therefore, considers whether the risk to the defendant, balanced against the factors outlined in 18 U.S.C. § 3142(g), rises to the level of a compelling reason for temporary release under 18 U.S.C. § 3142(i). In the context of COVID-19, four factors are to be considered in determining whether a compelling reason permitting temporary release under 18 U.S.C. § 3142(i) has been established: (1) the original grounds for detention; (2) the specificity of a defendant's COVID-19 concerns; (3) the extent to which the proposed release plan is designed to mitigate or exacerbate other COVID-19 risks to the defendant; and (4) the likelihood that a defendant's release would increase the COVID-19 risks to others. *Green*, 2020 WL 1873967, at *3 (citing *United States v. Clark*, __ F. Supp. 3d __, No. 19-40068-01-HLT, 2020 WL 1446895, at *3 (D. Kan. Mar. 25, 2020)). The defendant has the burden to show that circumstances warranting temporary release under § 3142(i) exist. *United States v. Sanders*, No. 19-20037-01-DDC, 2020 WL 1528621, at *3 (D. Kan. Mar. 31, 2020).

As discussed previously, the original grounds for detention weigh heavily against release and need not be repeated here. Regarding the second factor, the defendant does not claim that he has a health condition that increases his risk of contracting COVID-19 or increases his risk of complications if he contracts the virus.[1] In fact, the defendant admits that he is a "healthy person." Supplement (ECF No. 21 at 5). Rather, he cites the general failure of the DOC to protect detainees, including himself, from exposure to the virus. Supplement (ECF No. 21 at 2-5). Thus, the defendant has not established that the risk that the COVID-19 virus poses to him is greater than the risk faced by all other detainees at the D.C. Jail.

---

[1] No medical records were submitted in support of the Motion. Because the defendant does not claim that he has a specific physical or mental condition that puts him at a greater risk of contracting COVID-19, the Court does not find it necessary to obtain his medical records.

The generalized risk to the defendant must be evaluated in the context of the current conditions at the D.C. Jail. It is indisputable that the virus has infiltrated the facility. As of May 2, 2020, the District of Columbia reported that, within the DOC, 141 detainees have tested positive for COVID-19 (52 detainees are in isolation for a positive test, and 89 detainees have recovered); 832 detainees are in quarantine; and one detainee has died. *Public Safety Agency COVID-19 Case Data*, Gov't of D.C. (May 2, 2020), https://coronavirus.dc.gov/page/public-safety-agency-covid-19-case-data. Further, as of May 2, 2020, 61 DOC staff members have tested positive, 42 are in quarantine, and one has died. *Id.* United States District Judge Colleen Kollar-Kotelly of the United States District Court for the District of Columbia recently found that, although the DOC was aware of the risks posed by COVID-19 on its residents, the DOC "disregarded those risks by failing to take comprehensive, timely, and proper steps to stem the spread of the virus," in violation of the detainees' due process rights. *Banks*, 2020 WL 1914896, at *11.

The DOC has implemented substantial measures to protect detainees from being exposed to COVID-19. *See DC Department of Corrections' COVID-19 Response FAQs*, DC Dep't of Corr., https://doc.dc.gov/page/coronavirus-prevention (last visited May 1, 2020). Further, Judge Kollar-Kotelly has ordered the DOC to take additional actions at the D.C. Jail to protect detainees, including triaging sick call requests, implementing social distancing policies, and ensuring that DOC staff are equipped with personal protection equipment. *See Banks*, 2020 WL 1914896, at *13-15. Notably, Judge Kollar-Kotelly did not order the release of any inmates detained in DOC facilities. *Id.* at *13. The implementation of Judge Kollar-Kotelly's order should eventually alleviate the risks cited by the defendant. *See United States v. Sagastume-*

16

*Galicia*, No. CR 20-40 (BAH), 2020 WL 1935555, at *5 (D.D.C. Apr. 22, 2020) (expressing confidence that the DOC will do everything it can to comply with the Order).

Since the Fourth Circuit's remand order in *Creek* on April 15, 2020, this Court has denied requests for release under 18 U.S.C. § 3142(i) filed by defendants with and without heightened COVID-19 risk factors. *See United States v. Quander*, Criminal No. GJH-18-0334 (D. Md. May 5, 2020) (COVID-19, respiratory issues); *United States v. Williams*, Criminal No. SAG-19-0486 (D. Md. May 5, 2020) (bronchitis, asthma); *United States v. Frazer*, Criminal Nos. PWG-19-0545 & TDC-12-0047 (D. Md. May 4, 2020) (no specific risk factor); *United States v. Green*, Criminal No. RDB-20-0059 (D. Md. May 4, 2020) (asthma); *Lee*, 2020 WL 1974881 (obesity, high blood pressure, depression). *But see United States v. Hernandez*, Criminal No. PX-19-0158-9 (D. Md. Apr. 29, 2020) (defendant released under 18 U.S.C. § 3142(i), citing no specific risk factors); *United States v. Shaheed*, Criminal Nos. CCB-19-526 & CCB-19-527, 2020 WL 1914763 (D. Md. Apr. 20, 2020) (defendant released under 18 U.S.C. § 3142(i), citing asthma).

The third and fourth factors require the Court to analyze the defendant's proposed release plan. The defendant proposes that he be released to the custody of his mother and that he reside with his mother, her two daughters, and her three grandchildren in Baltimore. He proposes home detention with location monitoring, with release permitted for court appearances, medical appointments, and emergency purposes. His mother does not work and provides child care for his nieces and nephew. Thus, his mother would be present to supervise him. No one who resides at the residence has a coronavirus-related health condition. The defendant would be able to self-quarantine in the basement of the residence. Further, transportation can be arranged to transport him from the Baltimore courthouse to his mother's residence. *See* Motion (ECF No. 15 at 4-5); Second Supplement (ECF No. 21 at 6-7).

Recently, United States Magistrate Judge J. Mark Coulson commented on the third and fourth COVID-19 factors outlined above: "The remaining two factors depend in large part on how compliant Defendant would be with the directives of public officials and health experts should he be released.  Given his poor prior track record with compliance on supervised release conditions, the Court has significant pause."  *Green*, 2020 WL 1873967, at *3.  This Court shares Judge Coulson's concerns.  As has been discussed earlier, the defendant has performed poorly on community supervision in the past, and the present offense allegedly occurred not long after his supervised release in a prior firearms case expired.  The Court has significant concerns not only that the defendant would not comply with release conditions, but also that he would not comply with directives from public officials and public-health experts regarding COVID-19 precautionary measures.  Although the conditions at the D.C. Jail are serious, they are being monitored and addressed by the District Court for the District of Columbia.  Further, the defendant does not suffer from any health condition that puts him at a greater risk for contracting COVID-19 than any other healthy detainee at the D.C. Jail.  For these reasons, the Court finds that the § 3142(g) factors outweigh the risk that the COVID-19 virus poses to the defendant, given his medical condition and the current COVID-19 situation at the D.C. Jail.  Thus, the defendant has not established a compelling reason for release under § 3142(i).

VI.  FIFTH AMENDMENT RIGHT TO DUE PROCESS

The defendant also challenges his continued detention by claiming the Fifth Amendment entitles him to protection against unreasonable risk of future harm.  *See* Reply (ECF No. 18 at 3-4).  Regarding the defendant's Fifth Amendment due process claim, the Court finds that the remedial measures ordered by Judge Kollar-Kotelly and undertaken by the DOC are an appropriate response to that constitutional concern, barring future evidence that conditions

continue to deteriorate nonetheless. *See United States v. Hernandez*, No. PX-19-158-9, slip op. at 5 n.2 (D. Md. Apr. 29, 2020).

## VII. REQUEST FOR TRANSFER

In the alternative, the defendant requests that he be transferred to the Chesapeake Detention Facility in Baltimore.  According to CDC guidelines, transfers of detained persons to and from other facilities should be restricted unless necessary to medical evaluation, medical isolation/quarantine, clinical care, extenuating security concerns, or to prevent overcrowding. The defendant has not established any of these reasons. *See Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, U.S. Ctrs. for Disease Control & Prevention (Mar. 27, 2020), https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdf.  Further, it has been a long-standing policy of this Court not to intervene in the decision of the United States Marshals Service regarding the place of detention of a defendant who has been ordered detained before trial, absent compelling circumstances.  The Court does not find such compelling circumstances here.

## <u>ORDER</u>

Accordingly, it is this 7th day of May 2020, hereby **ORDERED** that the defendant's Emergency Motion to Reopen Detention Hearing and to Order Pretrial Release (ECF No. 15) is **DENIED**.


Date: May 7, 2020                                          _____/s/_____
                                                                           Thomas M. DiGirolamo
                                                                           United States Magistrate Judge